We'll hear argument next this morning in Case 10-8145, Smith v. Cain. Mr. Shanmugam. Thank you, Mr. Chief Justice, and may it please the Court. In Brady v. Maryland, this Court established the now-familiar principle that the prosecution must hand over all favorable material evidence to the defense before trial. This case presents a flagrant violation of that principle. The Orleans Parish District Attorney's Office produced almost no relevant evidence to the defense before Petitioner's trial, and Petitioner was convicted of first-degree murder based solely on the testimony of a single eyewitness. Unbeknownst to the defense, however, that eyewitness had told the police on multiple occasions that he could not identify any of the perpetrators, or, as he put it, that he would not know them if he saw them. The suppression of those statements alone justifies a new trial. But the District Attorney's Office in this case also engaged in the wholesale suppression of statements of numerous other witnesses, statements that further undermine the sole eyewitness identification of Petitioner, and more broadly cast doubt on Petitioner's involvement and role in the shootings. If all of that information had been disclosed to the defense before trial, the jury surely would have viewed this case in a completely different light. The trial court therefore erred by rejecting Petitioner's Brady claim, and its judgment should be reversed. In our view, in order to conclude that Petitioner is entitled to a new trial here, this Court need do nothing more than to consider the suppressed statements of the key eyewitness, Larry Boatner. Respondent concedes that those statements were withheld from the defense before trial, and argues only that the failure to disclose those statements was not prejudicial. Those statements, however, could not have more clearly contradicted Boatner's confident identification of Petitioner at trial. Ginsburg. Well, he saw a picture, Boatner saw a picture in the newspaper, and that turned on the light for him, right? It wasn't any police suggestion. That is correct. The basis for Boatner's identification was that he saw a photograph in the New Orleans newspaper of Petitioner. It was in connection with an article describing the shootings and suggesting that Petitioner was one of the suspects in the case, and that was what led to his prior identification out of court. But just to be clear, Justice Ginsburg, we're not arguing today that the identification was somehow constitutionally problematic. At most, we're arguing that the identification was of questionable validity in light of the fact that Boatner had only a limited opportunity to see the perpetrators, and in light of the circumstances that led to his identification. Now, even if his identification were more clearly reliable, our argument today would be the same. In a case such as this one, in which the sole basis for linking the defendant to the crime is a testimony of a single eyewitness, and there is evidence that the single eyewitness said on multiple occasions that he couldn't identify anyone, we believe that absent extraordinary circumstances, that will be sufficient. Alito, are you exaggerating a little bit about the value of the impeachment evidence regarding Boatner? Now, my understanding is that he made his first statement to the effect that he couldn't identify anybody at the scene, when he had been at the scene where five people that he knew very well had been killed. He was lying on the floor with a big gash in his head. He was questioned at the scene, and at that time, and this was in the evening, he said, I can't identify anybody. But then later that very day, wasn't it, that very evening, after midnight, he was questioned at the police station, am I correct? And at that point, he gave a description. He did make an idea — he did provide a description of the person that he said was the one who first came through the door. So, you know, that — I don't know. And then later he said he — there were statements to the effect that he couldn't identify anybody. But in light of the fact that he did provide a pretty, you know, somewhat detailed description on the very evening of the event, doesn't that — aren't you exaggerating when you say that he said numerous times the effect of these statements that he couldn't identify somebody? Justice Alito, it is true that Boatner provided identifying details in the later statement that night. I would respectfully submit that they were relatively limited identifying details, simply the fact that the first man through the door had a low-cut haircut and gold teeth. And as we indicate in our brief, those were characteristics shared by numerous other suspects in the case. But I think more broadly with regard to both sets of statements at issue here, the State's explanations for those statements are at best plausible. And we really think that in a case such as this one, in which the evidence on its face is so clearly of high exculpatory or impeaching values, it takes something more than that. It is not sufficient for Respondent to argue here simply that even taking into account these statements, a rational juror could still reach the same result and return a verdict of guilty here, because this Court made clear in Kiles v. Whitley that the standard for Brady claims is not a Jackson v. Virginia-type sufficiency of the evidence standard. So, again, where you have statements that on their face are not simply statements calling a witness's credibility into question, but statements that really directly contradict the confident in-court identification, it would take an exceedingly persuasive explanation for those statements to defeat a showing of materiality. Now, with regard to the standard is a reasonable probability that the result would have been different? Reasonable probability? Yes, that's correct. And this Court made clear in Kiles v. Whitley that that's not a more likely-than-not standard. That is essentially the same standard that this Court has articulated for prejudice, for ineffective assistance of counsel claims under Strickland v. Washington. And by now, it's a quite clearly established standard. And, again, it requires something less than a showing of more likely-than-not and perhaps something slightly more than the showing required for harmless error under Chapman v. California. But I do want to touch upon the State's explanations for these statements and explain very briefly why we think that those explanations are, frankly, not even plausible. With regard to the first statement to which Justice Alito referred, the statement that was made at the scene approximately half an hour after initial — officers initially responded to the scene, the State's argument is that Boatner was somehow too traumatized to make an identification at the time. But not only did Boatner not so testify at the post-conviction hearing — in fact, he testified that he couldn't recall the statement at all — but the very officer who took the statement himself testified at trial in this case that at the time of the statement, Boatner was, quote, "...coherent and articulated very well the events that transpired," and that is at pages 137 to 138 of the Joint Act. Alito, I mean, that may be true, but if you were a juror and Boatner testified and he was cross-examined and they attempted to impeach him based on his failure to make an identification right at the scene, and he said, well, that was because five of my friends had just been killed and I was lying on the floor and I thought I was going to be shot, too, and I had a big gash on my head, and then a couple of hours later, when I collected myself and they asked me the same question at the same time, Boatner said, well, I didn't provide a description and didn't say I couldn't identify anybody. Do you think jurors would just dismiss that and say, well, he couldn't identify him at the scene, so he must have been lying when he identified — when he provided a description later at the police station? Justice Alito, I think that it's possible that a juror could credit that explanation at the time of the argument. Wasn't there — wasn't there an intervening — didn't he say five days after that he couldn't identify? And that was after what he said on the night, the same night, five days later? He said, I couldn't identify him. That is correct, Justice Ginsburg. But even if we didn't have the March 6th statement or statements, I would, frankly, be happy to take my chances with the jury, even with regard solely to the March 1st statement, in light of that testimony of Officer Ron Quillo, that Boatner was, in fact, coherent, articulated very well the events that transpired, just like any witness, and so on and so forth. So, again, we don't think that it's our burden to show that no juror could credit the State's explanation. It's simply that we think that that explanation doesn't hold water. Sotomayor, your argument now and in your brief suggests that you're relying most heavily on the failure to provide the impeachment materials of the only witness to this crime, and the only piece of evidence that ties your client to the crime. But you also mention other things, and Respondents spend 90 percent of their brief arguing against the other things. But I just want to clarify those other things. Number one, was the testimony mixed testimony about whether the assailants wore a mask across their face or over their entire head? What's the best take on what the evidence showed that was presented on that issue? There was some degree of variation in what the witnesses said. Now, in the main, we're talking again about statements that were withheld, and I want to lay out those statements very briefly, if I may. There were two eyewitnesses who made statements to the police indicating that some or all of the perpetrators, including the first man through the door, were wearing masks. Those were the statements of Shalita Russell and the statement of Dale Mims. Now, with regard to the statement of Shalita Russell, and this was what we believe was the dying declaration that she made at the scene in the immediate aftermath of having been shot multiple times, Russell said she saw people barge into the kitchen, one had a black cloth across the face, first one through the door. So it is at least theoretically possible that the perpetrator was wearing a mask. Sotomayor, do we determine that in deciding whether the withholding of the Brady materials was harmful or not? Do we give deference to the lower court's determination of that? Do they have to decide whether it was a dying declaration? What's the standard on something like this? The lower court did not make such a determination in this case on this or any of the other evidentiary issues that Respondent now advances, at least in part because it does not appear that Respondent advanced any of those arguments below. But I think more broadly, Justice Sotomayor, in terms of the role of this Court or any other court considering a Brady claim, this Court hasn't quite spoken to the specific issue of whether a Brady court is supposed to itself make an evidentiary determination where there's a question about admissibility. But the closest that this Court came was in Wood v. Bartholomew, in which this Court indicated that with regard to Brady material, it either has to itself be admissible or be reasonably likely to lead to admissible evidence. And the Court's reasoning in Wood v. Bartholomew was somewhat spare on that score. That was a summary, a reversal in a per curiam opinion. But I do think that it would be appropriate for a Brady court to make that determination itself or, at a minimum, make a determination as to whether it appears that it's reasonably likely that the evidence would be admissible. Here, we really don't think that it's a close question, particularly with regard to the statement of Shalita Russell, because the context of the handwritten notes makes clear that the statement was taken at the scene of the crime. Shalita Russell was taken to the hospital approximately a half an hour after the shootings occurred. She told two witnesses that she believed that she was dying. And so under the law on dying declarations, and I have no reason to believe that the law is any different in Louisiana from the Federal system or the 49 other States, that would comfortably satisfy that requirement. Sotomayor, Mr. Mims was the neighbor who saw the two – there were three assailants in total, right, and two left the scene? There's some doubt as to whether or not there were three or four assailants, and Mims himself, in all candor, was a little bit inconsistent on that point. But he consistently said, both in the handwritten notes and in his testimony at the post-conviction hearing, that all of the assailants, however many there were, were wearing masks and that he saw them as they were getting into the car. He didn't say anything further other than that the masks were ski-type masks. But the State's argument with regard to the materiality of Mims's statement is that it is possible that the men would not have been wearing masks when they entered the house to allegedly commit the armed robbery, and therefore, the fact that Boatner saw the first man unmasked can be reconciled with this statement. And again, we would be happy to take our chances with the jury and make the argument that that would be an exceedingly unconventional way to go about committing an armed robbery. And again, with regard to the Russell and Mims statements, I think it's important to remember that we view those statements as going directly to and contradicting Boatner's in-court identification. And so in some sense, we view those statements as being of a piece with Boatner's own prior statements in which he indicated that he could not identify anyone. Alito, did the defense have any theory as to why Boatner would lie about whether he could identify this individual? First of all, Justice Alito, it would, of course, not be the defense's burden in any subsequent retrial to come up with a theory of its own. The defense could simply argue, as it did at the first trial, that the prosecution simply didn't bear its burden on reasonable doubt. But that's not the case. Alito, the impact of your impeachment evidence would be related certainly to if a juror would ask, well, why would he lie about this? And I'm just asking, did the defense have any theory about what his motive would be about whether he could identify somebody, whether this first person had a mask or not? As this Court will be aware from its recent consideration of eyewitness evidence, it doesn't necessarily follow from the fact that an eyewitness identification is mistaken, that the eyewitness was somehow lying about it. It may very well have been that Boatner made a mistaken identification in good faith out of a desire to identify the person who killed several of his friends. And indeed, as the amicus brief of the Innocence Project explains in this case, there is a phenomenon known as mugshot exposure effect, where an individual who sees a mugshot in some other context is more likely to identify that same person when confronted with a subsequent lineup. Of course, whereas here, the individual is exposed to the mugshot for the first time in seeing a newspaper article that depicts the individual in question and suggests that that individual is a suspect in the crime, it would not at all be unusual for the individual when confronted with that photograph again in a lineup a few weeks later to pick that individual. But the first time he said that the person wasn't masked and provided a description was long before he saw any mugshots. It was the evening of the event. It was when he was questioned at the police station. Well, on the evening of the event, he provided those limited details about the gold teeth and the low-cut haircut. Yeah, but by doing that, he's saying this person wasn't wearing a mask. That's the critical point. Well, that may suggest that the person was not wearing a mask. Of course, it's possible that the person somehow had part of his face covered. But I think it's important to realize, Justice Alito, that even with regard to that statement, while it is true that Boatner provided those limiting details, he also made statements suggesting that he was not confident of his ability to actually make an identification. And in that statement, which is found at page 296 of the Joint Appendix, he says, I was too scared to look at anybody. I wish I could give you all a description. So in some sense, we think that the focus on the gold teeth and the low-cut haircut in this case is a bit of an aside, because the question here is not whether he saw enough to support the subsequent identification. The question is whether his suppressed statements in which he repeatedly said, I can't make an identification, contradict his in-court confident identification of Petitioner. And we think that in order to decide this case, all that the Court essentially needs say in an opinion is that in a case such as this one in which all you have is the identification of a single eyewitness, where you have statements in which that eyewitness said, I can't make an identification, and those statements have concededly been suppressed, the Brady materiality threshold is satisfied. Sotomayor, right? Kennedy, in looking at the appendix, there are some asterisks. Were these statements, the first two statements, the one at 252 in the Joint Appendix and then the statement on March 2nd, which is the one you just referred to, 296, were parts of those statements given to the defense counsel or none of the statements? And how long were the documents? Were they 20 or 30 pages? Can you tell me a little bit about that? First of all, none of those statements were given to the defense. The only relevant ones. I shouldn't have said statements. None of the reports. Yes. None of the statements or the surrounding materials was given to the defense at all. The only even remotely relevant thing that was given to the defense was the initial police report, which was a 5-page document prepared by the officers who initially responded to the scene with a 1-page narrative of what took place. And that document, for the Court's reference, is in Volume 10 of the initial record that was received from the district court at pages R, 1907 to 1911. Now, with regard to these specific statements, both the narrative statements and the handwritten notes, the narrative statements were contained in a relatively voluminous document. I believe it was an 83-page document that was a narrative prepared by Officer Ronquillo that set out everything that took place over the course of the investigation. And none of that was disclosed. Respondent makes the argument that the trial court reviewed that document in camera, but we think that it is somewhat unclear what, if anything, the trial court actually reviewed in camera. There's no dispute that that document was not handed over to the defense. With regard to the handwritten notes, there actually are a relatively small number of relevant handwritten notes in this case, but all of them were contained in the police files, and none of them, none of the ones at issue on which we're relying was handed over for trial. So this is not a case in which selective materials were handed over. None of this material was handed over. And that's why we really think that this is a case that involves the categorical withholding of documents and not simply the withholding of selected documents that may subsequently turn out to be relevant. Can you just tell me, how does Brady work? Is there some obligation for the defense counsel to say, please give me all relevant reports? No. This Court has made clear that a request is unnecessary to trigger the Brady obligation, and this Court has made clear in cases dating back to Brady itself that the good faith or bad faith of the prosecutor is irrelevant. And, of course, the prosecutor has a duty under Brady to hand over not only materials in the prosecutor's own possession, but also materials in the possession of the police as well. Sotomayor, is this group or gang, all of them had gold teeth and faded haircuts? There were five other suspects who had gold teeth or and low-cut haircuts. Three of the other individuals who were primarily in the frame for this murder had those characteristics. I believe that the three were Bannister, Phillips, and Young. The only other suspect who's a reasonably likely suspect who didn't was Robert Trackling, the suspect whose confession to involvement in these shootings was withheld. In short, faded haircuts and gold teeth were not a unique characteristic. They were not uncommon in the 1990s. Scalia, what were these? These are uncommon to me. These were not gold teeth that were implanted, right? What was it, some kind of a mouthpiece of gold? I have to admit that my familiarity with this practice is perhaps not that much greater than yours, Justice Scalia, but my understanding is. I'm sorry to hear that. My understanding is that these are gold teeth that are worn either as temporary or perhaps semipermanent implants and that in hip-hop culture in the 1990s, this was relatively common. But whatever the provenance of this practice, it is undisputed on this record that multiple other suspects had those characteristics. Justice Sotomayor, there was one thing you asked that I just want to get back to with regard to the remaining categories of evidence. I just want to set them out and then I would be happy to answer any questions that the Court has about them. And if there are no further questions, I will reserve the balance of my time. As we explained in our brief, there are three other categories of evidence at issue here. There was the statement of Philip Young, Petitioner's co-defendant, suggesting that Petitioner was not involved in the shootings. There were also the statements that would have called into question the prosecution's theory that Petitioner was one of the shooters, a theory that was essential to establishing the intent required for first-degree murder under Louisiana law. Louisiana is somewhat different from other States in that it doesn't require a premeditation, but it does require a specific intent to kill or inflict great bodily harm. Alito, on that point, the State says that you're drawing a meaningless distinction between a 9-millimeter handgun and a 9-millimeter automatic pistol. Well, we don't think that's a meaningless distinction. And we cite numerous sources in our brief that draw precisely that distinction. But I think that what's noteworthy with regard to the statements at issue is that both Boatner, who identified the weapon that the perpetrator whom he believed to be Petitioner was carrying, and the State's ballistics expert, Kenneth Leary, who identified the weapon that was responsible for the firing of the casings at issue, conspicuously failed to say that the weapon at issue was a 9-millimeter handgun. But at trial, their testimony suddenly converged. And Boatner, who had previously said only that the perpetrator was carrying a handgun, said that the perpetrator was carrying a 9-millimeter handgun. And Leary, who said that the casings at issue had come from a machine pistol of the Intratec or MAC-11 type, suddenly said that they came from a 9-millimeter handgun instead. And so at a minimum, if the defense had possessed those statements, it could have sown doubt on whether the firearm was, in fact, one and the same, and therefore sown doubt on a critical element of the offense at issue. And finally, the only other category. Sotomayor, I'd just like to go back to that, because I'm not sure I understand the argument. Both the ballistics expert at trial said that the casings were consistent with a 9-millimeter, and I know that Boatner said that it was a 9-millimeter that was used. And the issue is whether anybody would call a MAC gun a handgun as opposed to an automatic pistol, correct? Well, that's right with regard to Leary's testimony. I think the thing that was a little bit odd with regard to Boatner's testimony was the sudden degree of specificity, having said only that it was a handgun or a chrome automatic in his prior statements. He said at trial that it was a 9-millimeter handgun, which he had not previously said in the statements that were withheld. And finally, the last category of evidence consists of the notes of the interview in which Eric Rogers relayed Robert Trackling's confession to involvement in the shootings. As the amicus brief of the NACDL points out, courts have routinely held that confessions by other perpetrators constitute exculpatory evidence, even with regard to offenses that may have had multiple perpetrators. And we certainly believe that at a minimum, the suppression of those notes, when there is no evidence, comfortably satisfies the Brady materiality standard. And it's for that reason that we think that the judgment of the trial court should be first. Mr. Shanmugam, just a quick one. Is all the evidence that you're discussing here today, was that presented to the State Post-Conviction Court? Yes. We believe that all of this evidence was before the State Post-Conviction Court. Thank you, and I'll reserve the balance of my time. Thank you, counsel. Ms. Andrew. Yes. Mr. Chief Justice, and may it please the Court. The only survivor who could identify the assailant who led the massacre in the small home at 2230 North Roman Street was Larry Boatner. He identified Larry – he identified the petitioner after having searched the faces of 72 individuals who were presented to him in photo lineups, one after the other. And yes, Justice Sotomayor, several of those faces or several of those individuals bore short, fade haircuts. And yes, some of the individuals who were pictured in those photo lineups were other suspects. The record reflects that Mr. Boatner scrutinized those 72 faces. At one point, lineup 11 was shown to him on March 22nd, and he remarked about the haircut. He said, my assailant wore his hair like this. Was this – was this lineup, was this after Boatner saw the photograph in the newspaper? No, it was not. I believe the photo – Mr. Smith's photograph was pictured in the Times-Picayune newspaper on June 7th, and this particular lineup was shown to Mr. Boatner on March 22nd. So at that point, lineup 8, he stopped and remarked about the hair. And he was – Sotomayor, could you tell me why Boatner waited two weeks to – or never told the police that the face that he saw in the newspaper was the face of his assailant? I – I – as I understand the facts, he says he saw the newspaper, recognized  Yes, ma'am. until they presented him with a lineup including Mr. Smith's face, that he identified Mr. Smith. What's the reason for the delay? His reason, Your Honor, is – is contained most specifically on page 191 of the Joint Appendix, and it is, frankly, that he was afraid. He obvious – and I think the jury would have understood that. He obviously knew what Mr. Smith was capable of. He – I'm sure he feared And so what turned – what changed his mind once the police showed him the lineup? Well, I don't know that he changed his mind, but he was presented with a lineup, and when he was presented with a lineup, he very quickly identified Juan Smith and said, that is him, I will never forget his face. So – And that was before or after the picture? That was after. And all of this, by the way, was vetted during – during a motion to suppress hearing. When the trial judge learned that the photograph had been shown in the newspaper, he reopened the hearing on the motion to suppress to determine – and over the State's objection, we argue that this was not State action, but he reopened the motion to suppress to determine for himself whether or not that newspaper had in any way tainted the later identification of Juan Smith. I mean, I thought – I mean, I thought the issue is that there were some notes. And the first note, which was made on the day, the policeman says that Boatner said he could not supply a description of the perpetrators. Others didn't say they were black males. Then he said they had golden teeth and low-cut haircut. And five days later, he said he could not ID anyone because he couldn't see faces. Then he said he'd only glanced at the first man. He couldn't tell if they had their faces covered and didn't see anyone. Then he said, I could not ID, would not know them if I saw them. And another set of police notes says he said that he could not identify any of the perpetrators of the murder. So I guess those are all notes that the prosecution did not give to the defense. So if you were a defense lawyer, whatever this other stuff is, I guess you would have been pretty happy to have those notes, because you might have tried to impeach his identification. Yes. And so what are you saying, that I guess it would have made no difference? That's correct, Your Honor. And I'd like to hear that, because it seems on its face that it certainly could have made a difference, that if he had those notes, that he could have tried to impeach him and said, where did this sudden recognition come from? And I can appreciate your concern. This Court has held that favorable evidence for this Court has held that favorable evidence, which is not material, need not be turned over to the defense. And if it's not material, here is the only eyewitness. Yes. And we have inconsistent statements. Are you really urging that the prior statements were immaterial? Yes, Your Honor. If I may put them in perspective. Mr. Boatner provided two statements. I'm sorry. Mr. Boatner provided a statement on the scene, two statements the day of the incident. To a first responding officer, who was not Detective Ronquillo, he gave a description. And that description was, heavy built, with a hair with a fade, with a little small top, with a lot of gold in his mouth. That was while he was at the scene. Later, homicide detective John Ronquillo arrived at the scene, and apparently, according to his notes, and most importantly, according to his post-conviction testimony, he asked Larry Boatner for a description. And Larry Boatner said, I can't give you a description. I'll put them all in perspective and then go back to what Detective Ronquillo and Mr. Boatner had to say about that. But in any case, Mr. Boatner's severe laceration was treated, and then he was escorted to the homicide office, where he gave his formal statement. And in that statement, part of which has been reproduced here by opposing counsel, Mr. Boatner said, I can tell you about the one, the one who put the pistol in my face. He was a black male with a low cut, golds in his mouth. I don't know how many. That's all. I was too scared to look at anybody. All of them had guns. One with an AK, one with a Tech-9. The one who hit me had a chrome automatic. It was big. So here. Roberts. And you could argue, presumably did argue that before the jury, and that would be compelling evidence for the jury. And if you were the defense lawyer, you really would like to have that statement where he said, I couldn't identify them. You would like to have it, but it's not material, because sandwiched between two descriptions and he's between two descriptions, he says, I can't identify. And take it. Ginsburg. How does that make it not material? You can argue that it should be given diminished weight. But an inconsistent statement by the only eyewitness seems to me most material and useful to the defense in cross-examining the eyewitness. I really don't understand how you can argue that the jury shouldn't put much weight on it because of the other things. But to say that it's immaterial, I find that that is not plausible. Scalia. And not only the only eyewitness, but if I understand it correctly, the only evidence against the defendant, this was the only evidence against him, this one eyewitness identification, right? Was there anything else? There was. The identification of Juan Smith was bolstered by evidence, by testimony of the brother of Philip Young, the perpetrator who was left at the scene as an aphasic amnesiac. So he established a link that the two were known to each other, Juan Smith. And but, yes. But just on the materiality point, I just have to agree with Justice Ginsburg. What you're telling us is that when the defense stands up and said, and isn't it true that in this statement, which you just have testified to on direct, in which the police have put in on direct, you also said you could not identify any perpetrators of the murder, and then the prosecution says immaterial, and the judge says strike. I just can't believe that. But that's not what he says. He says, I can tell you about the one, the one who put the pistol in my hand. Breyer, I'm talking about the Boatner statement of 3695, in which Boatner told police he could not identify any of the perpetrators of the murder, JA 25960. And you say that's immaterial. I find that just incredible. Is it that you mean immaterial, or is it that you mean that it wasn't prejudicial, because there's so much other evidence, there was no reasonable probability it would have made a difference in the trial? That is what I mean, yes. Breyer, so we can forget the word material. Now, you're saying there's so much other evidence here against him that it wouldn't have made any difference. Yes. Now, I can understand that argument, but I don't know if it's right. That is, that is, now I think I can go back to Justice Kennedy's question, put it in those terms, and say, well, why wouldn't? This could have made a difference. I mean, here we have this witness who said all these great things for your side, and within a space of hours, he's been telling the policeman he can't identify anybody, he doesn't know. I mean, what, what, that sounds like there's a probability that would have made a difference. Why not? Among the most important evidence in this case is the testimony or the transcript from the post-conviction relief hearing. John Ronquillo, whose notes these are, was asked about the March 6th statement. And I guess we are fast-forwarding. The statement after the statement made, the one made in the homicide office, was made on March 6th. And at that time, Detective Ronquillo called Larry Boatner, and Larry Boatner said, I can't identify anyone. And what Detective Ronquillo had to say about that, first of all, Larry Boatner didn't remember saying that. But what Detective Ronquillo had to say about it, and he was the person who was, whose impressions, about whose impressions were speaking, was that at that point, Mr. Boatner, like many murder witnesses, was retreating, temporarily equivocating, as we wrote in brief. He was retreating somewhat from his assistance with the police. Not an abnormal phenomenon. Sotomayor What if, could the jury be entitled to reject that conclusion? They have four statements by this man, who Ronquillo described as very coherent, very with it, at the scene of the crime. Would a jury be entitled to reject that excuse by Ronquillo? They would, Your Honor. And if they were entitled to do that, why would the absence of four statements that I can't identify someone, not have been an argument that defense counsel could have used, number one, and that had a reasonable probability of making a difference? First of all, there were not four statements. There were two statements that were made where Boatner said he couldn't identify anyone. Again, he gave two statements the day of where he described, and one statement at different hours. I'm sorry? At different hours. Yes. And to different officers. Yes. So that's two statements. My math is wrong? I'm sorry. Those are statements where he inculpated the defendant. There are two statements. Starting on the scene, there is a statement provided to the first responding officer where he provides a description. Larry Boatner provides a description. But it was a description that other suspects fit. The close-cut hair, the gold teeth, that didn't identify Smith as opposed to the other suspects who had those same characteristics. Yes. And those other suspects' photographs were all contained in photo ID, in photo lineups, and Mr. Boatner never selected one of them. The other thing is he gold teeth. He knew that his perpetrator had gold teeth. The next time he saw Mr. Smith was at trial in court, Mr. Smith revealed his teeth and he had gold teeth. But as far as the other suspects having the haircut or physical, similar physical characteristics, attributes. It was a prior inconsistent statement, and we can argue about whether there were more consistent statements than inconsistent statements. But to say that this was not Brady material, we're not saying that Larry Boatner made up a story on the stand that didn't conform to the truth. The question is, should the prosecutor, should the defense attorney, have access to a prior inconsistent statement? And this Court has said that Brady is a reflective, he is a reflective analysis. He did not make up a story on the stand that didn't conform to the truth. Alito Can you explain how this took place? You have a case in which you're relying almost entirely on the testimony of one witness. And you have these notes that were taken by and are presumably in the possession of the lead investigator. Wouldn't any prosecutor ask the lead investigator, do you have any statements of this witness? They have to be examined, and if there's anything in them that is impeachment material, they have to be turned over to the defense. And under Louisiana laws, there are a rule that requires the turning over of statements by witnesses, prior statements by witnesses. Under Louisiana law, prior statements of witnesses are not discoverable. But, of course, under this Court's decision in Brady v. Maryland, if the prosecutor makes a determination that they would materially affect the outcome of guilt or innocence You have to supply statements by a witness when they take the stand, don't you? Rosario material, don't you have to turn over? No. Not in the State of Louisiana, you don't have to turn over witness statements when they're taking the stand? No. And these statements were provided in camera. There was a defense filed a motion for discovery, and he asked for Brady material. He asked specifically for the supplemental report, which is where these statements are contained. Are you claiming that the judge's failure to catch these inconsistencies excuses your Brady obligation? Not at all. The Brady obligation is ours. In fact, we believe that that's actually a poor practice, but it is one. Andrew, if I could go back to Justice Alito's question, was the problem here that the prosecutors never received these statements from the police officers, or did the prosecutors make a determination similar to the kind of argument that you're making today, make a determination that these statements simply should not be turned over because they are not material? The prosecutor in this case actually turned them over to the trial court for an in-camera inspection. And articles, Louisiana Code of Criminal Procedure, Article 718, actually provides for that practice. It's so odd that, I mean, look, look, it sounds like here it is, 5 days after the shooting, and well before, I guess, that this witness saw any mug shots or did anything. And he says, I could not identify anyone because he couldn't see the faces of the people. And now you're saying later, which you introduce into trial, is having looked at the faces of the people and identified them from their faces. Now, previously he said he couldn't see their faces. And in Louisiana, the State of Louisiana, the prosecution and the judges say that isn't a — you don't have to turn over that statement that he couldn't see the faces made earlier. No. I'm sorry. When he's saying that he could not see the faces, he is not referring to Juan Smith. He and Detective Ronquillo testified at post-conviction that he always said he could identify the one, the one whose face appeared a handgun's length from his own, unmasked, when he opened that front door at 2230 North Roman. Detective Ronquillo put this in perspective at post-conviction. And as I said, the entire — But, Your Honor, all these — all these statements that we have here, you're saying all referred to people other than the defendant. Juan Smith. Yes. All right. Well, was there a finding on that? There was — the judge did not give express findings of fact or finding of law. But — Perhaps the defense would have liked to say they did apply to the defendant. You don't say all of them. All of them didn't apply to the — No. The one at the scene, when he says I can't describe anyone, he is clearly at the scene. That applied to everyone, right? I'm sorry. The one at the scene applied to everyone. To everyone. I can't identify anyone. March 6th applied to everyone. Everyone except Juan Smith.  So he applied to — Wait. I'm sorry. You've lost me there. When he says I can't identify anyone, Smith is out of that group already? Oh, I'm sorry. No. He's — I'm sorry. In both circumstances, he is saying — the first time he's saying I can't describe, the second time he is saying I can't help you, I can't identify everyone. But the jury wouldn't determine if I can't help you. I can't identify everyone or anyone? Anyone. Okay. And the jury would have heard — He says I can't identify anyone because I couldn't see faces. Okay? That's what it says here, at least in my notes that my law clerk's gathered. And — and — all right. And my — my point then is, this seems very odd, I mean, really unusual that in the case of a case like this, there is some kind of system that doesn't turn that statement over to the defense. It was turned over to the judge under Article 718 for in-camera inspection. Where is that reflected in the record? That's on October 31st of 1995. There is a hearing. What you said in your brief was that the judge determined that the supplemental report relating to the North Roman Street murders contained no Brady material. Yes. Mr. Smith — I didn't understand the record to be that all of Boatner's statements, all the statements of Boatner that we're concerned about now were examined by the judge before trial? Yes. And the record reflects that? Do you know where? The transcript of October 31st, 1995. The — And is it the view of the prosecutor's office that because those materials were turned over to the judge, assuming that they were turned over to the judge, that that obviates the Brady obligation? Not at all. Is that the view of the prosecutor's office? Not at all. We believe it's a bad practice. But it is — Did you concede there was a Brady violation in this case? Did we concede? Do you now concede there was a Brady violation in this case? No. You're telling the Court that this should have been kept from the defense all over? Under this Court's decision, in Kyle's, I believe a prudent prosecution prosecutor would have disclosed it. I do not — But Kyle's is a decision saying what the prosecutor must disclose, not it's a good practice. No. But — So is there a Brady violation under our holding in Kyle's? I'm sorry? Is there a Brady violation under our holding in Kyle's? No, there is not. So explain why what is on its face, seemingly inconsistent statements, are not required to be turned over. If, with regard to the March 6th statement, where Larry Boatner tells John Ronquillo at that point, I can't identify anyone, what Mr. — what Detective Ronquillo had to say about that is dispositive. And he said at that point Larry Boatner was withdrawing from — he was afraid he was withdrawing from police assistance. I don't understand how he becomes the arbiter of what's Brady. You said to me earlier that a jury would be entitled to reject his conclusion. All right? Tell me what — how his conclusion makes it non-Brady if a juror could decide differently. The post — the post-conviction testimony is pivotal because there is a petition that's filed with attachments, with exhibits. That is what gets and that is what got Mr. Smith his day in court, his four-day post-conviction hearing testimony. Post-conviction hearing. Larry Boatner took the stand. What Larry Boatner had to say and what John Ronquillo had to say, because, after all, these are John Ronquillo's notes, I think are important, and I think they're important in a Brady analysis, because when those are — There's two components to Brady. Should they have been turned over? And if they had, is there a reasonable possibility of a different outcome? There is not. Should they have been turned over? That's the question that I think my colleague asked you, and you're saying no. No. I believe that a prudent prosecutor would have. I believe we're tacking a little bit too close to the wind, but a prudent prosecutor would have. I also think that — All right. Now articulate what legal theory would say these are not Brady, these are not materials that needed to be turned over, when they say, could not ID, would not know them if I saw them, can't tell if had faces covered, didn't see anyone. That's one of the notes. The other one, I don't know how many, that's all. I was too scared to look at anybody. And what makes any of those statements? If Mr. Boatner could not identify anyone, Mr. Boatner would not have viewed 15 lineups. When the lineups were presented to him — This is all a jury argument. I'm sorry. Tell me why they didn't on their face constitute Brady materials that needed to be turned over. What's the legal principle that doesn't make them Brady? Because if they had been presented, if those statements had been presented to defense or presented to a jury, the outcome would have remained the same. How do you know? How do you know? How can you possibly know? The jury is supposed to decide on the credibility of this witness. There's a statement that he made a prior inconsistent statement. Mr. Shanmugam outlined five categories of what he called Brady materials. Is — are you maintaining that none of those categories, that there was no Brady material at all in this case? Yes. You're speaking of the other pieces of evidence? Yes. Yes. Well, I'm not sure if the Charity Hospital medical records of Mr. Boatner are still being urged to this Court. I'm talking about Mims and what was the woman's name? Russell? Shalita Russell. And Young and the snitch, the one who said that his cellmate told him that his cellmate was the perpetrator. Well, to be clear, Ms. Russell never made a dying declaration. What the defense is presenting to this Court as evidence of a dying declaration are words and dashes of Detective Ronquillo written at some point where he — written at some point where he told the judge that it wasn't a dying declaration. The judge, again, did not make specific facts of finding or law. The judge — I'm sorry. Because it was not — because it was not turned over. And with all respect, I think you misspoke when you asked what is the test for when Brady material must be turned over. And you said whether or not there's a reasonable probability, a reasonable likelihood, pardon me, a reasonable probability that the result would have been different. That's the test for when there's been a Brady violation. You don't determine your Brady obligation by the test for the Brady violation. You're transposing two very different things. And so that's incorrect. And I'm sorry, Justice Ginsburg. Your — Shalita Russell did not give a dying declaration. Let's go to Mims, who said, I saw them — I saw the perpetrators go to their car when they were exiting. They had ski masks. And that information — Dale Mims testified at post-conviction. He testified he did not see the assailants arrive. He did not see the — But isn't it most unlikely, as your — as Mr. Shanmugam said, that robbers — I mean, people who are entering, intruding on another's premises to rob or whatever else they're going to do, would wear masks going out but not going in? I mean, they don't want anybody — they don't want anybody to be able to identify them. And it's plausible that Mr. Boatner — I'm sorry, that Mr. Smith masked himself upon escape after — But is that really — I'm sorry. I thought the idea was they were going to kill everybody who might have seen them inside. Their only worry would be someone who would see them outside, right? Yes. So worried that the car that they arrived in had no license plate. They were definitely looking not to be identified. Ms. Andrew, did your office ever consider just confessing error in this case? I'm sorry? Did your office ever consider just confessing error in this case? You've had a bunch of time to think about it, you know. We took cert a while ago. I'm just wondering whether you've ever considered confessing error. Your Honor, we believe that we have an argument that these statements of Larry Boatner are not material. The other evidence that Mr. Shamagam has put before this Court were either not suppressed or not favorable. Larry Boatner gave several — he did describe Juan Smith. He described him on several occasions. And he ultimately identified him. And he identified him after scrupulously viewing 13 lineups. So the suggestion that he said at one point, because he's equivocating, because his name is on — his name, address, contact information are on the police report. It is not a surprise, and I don't think it would be a surprise to Orleans Parish jurors to find that early in an investigation, a murder witness equivocates. But you're taking that judgment away from the jury. There was a prior inconsistent statement. Shouldn't that be the end of it? A prior inconsistent statement, one that is favorable to the defense, has to be turned over, period. I thought that was what Brady requires. And in this case — May I suggest that you stop fighting as to whether it should be turned over. Of course it should have been turned over. I think the case you're making is that it wouldn't have made a difference. Made a difference. Yes. And that's a closer case, perhaps. But surely it should have been turned over. Why don't you give that up? Well, and I actually thought I had when I said a prudent prosecutor would. But in making a sort of over-the-shoulder, rear-window Brady analysis, I don't think that these statements, that the statements made to Ronquillo, the statement made to Ronquillo at the scene where he's all shook up and he says, I can't describe anybody, then he goes to the hospital, gets a severe laceration, take out her arm. Counsel, my worry is the following. You read Cullen. I'm sorry? You read Cullen. Yes. You read the dissent in Cullen. There's been serious accusations against the practices of your office, not yours in particular, but prior ones. It is disconcerting to me that when I asked you the question directly, should this material have been turned over, you gave an absolute no. It didn't need to be. It would have been prudent, but it didn't need to be. That's really troubling. And I think I misunderstood your question. I think I misunderstood your question. Should it have been turned over? Yes. Now that we are here, 16 years later, and the Court is making. That's the second prong of Brady. I said there were two prongs to Brady. Do you have to turn it over in second? Does it cause harm? On the first one, you said not. That, it is somewhat disconcerting that your office is still answering equivocally on a basic obligation as one that requires you to have turned these materials over. Your Honor. Whether it caused harm or not. If I may explain. I obviously misunderstood your question. Present-day prosecutors. I'm sorry. May I tell you? Very briefly. I mean, what if today we turn all of this over? Our only concern is redacting victim information, identifying information, so that for victim safety. But it should have been turned over. I guess what I was addressing or attempting to address was the materiality prong of Brady. Thank you, counsel. Mr. Shanmugam, four minutes. Thank you, Mr. Chief Justice. Just three very quick points. First of all, with regard to Larry Boatner's statements on March the 6th. Justice Breyer, you will be happy to know that your law clerk's notes were correct. Boatner on March the 6th said, and this is at page 308 of the Joint Appendix, could not ID anyone because couldn't see faces, can't tell if had faces covered, didn't see anyone, would not know them if I saw them. I'm not surprised there. It is quite clear that that statement applies to all of the perpetrators. The State advances the argument today, as it did in its brief, that Boatner must have been too scared to cooperate by March the 6th. But that is utterly belied by the record in this case. Boatner continued to cooperate with the police investigation in the following weeks, reviewing police lineups. He even testified that he wanted to go looking for Petitioner after seeing his photograph in the New Orleans newspaper, pages 489 and 494 of the Joint Appendix. He didn't leave New Orleans until June, three months later, and he actually returned to New Orleans before Petitioner was even apprehended. So, again, I'm not surprised. Isn't there an understanding that all of Boatner's, all of the notes about Boatner's statements were turned over to the judge before trial for in-camera inspection? Justice Alito, it is entirely unclear, based on this record. Counsel for Respondent cites the transcript from October 31st, 1995, a transcript that wasn't even prepared until after cert was granted in this case. It's clear that the Court reviewed something, but it is entirely unclear from that transcript what the Court reviewed. And, of course, even if the Court had made an in-camera determination, it would in no way, in no way affect our claim after the fact here. My second point, the State today for the first time says, in response to the question from Justice Scalia, that there was more evidence here linking Petitioner to the crime and relies on the testimony of Eddie Young, the brother of Philip Young, the individual who was found at the scene. But the sole substance of that testimony was that Philip Young knew Petitioner, and we would respectfully submit that that is scarcely inculpatory, and if it was, anyone in New Orleans who knows a felon ought to be worried. And, therefore, we really don't think that that adds anything to the evidence in this case. The sole evidence linking Petitioner to the crime was the statement, the testimony of Larry Boatner. Third, there's been some discussion about the language in this Court's cases in Kiles and Eggers, suggesting that prosecutors should err on the side of caution. That is part of the constitutional standard, because, after all, the materiality requirement is part of the requirement for a constitutional violation under Brady. But all of the evidence at issue here, including Boatner's statements, was withheld from the defense, leaving aside this question of what the trial court may have reviewed in camera. And the prosecutor's conduct in this case, with all due respect to Ms. Andrew, was not, quote, a little too close to the wind. The Orleans Parish District Attorney's Office acted with flagrant disregard for its obligations under Brady in this case. The Brady standard has been around for half a century. There is no real ambiguity about what that standard requires. And we think that the conduct in this case was, in fact, egregious and clearly violated that standard. We think that the trial court erred by rejecting Petitioner's Brady claim, and for that reason we think that its judgment should be reversed. Thank you. Thank you, counsel. Counsel, the case is submitted.